Each side has 20 minutes, so if you want rebuttal time, you've got to stop short of that total. Thank you, Your Honor. May it please the Court, my name is Jim Bopp. I represent the California Pro-Life Council. This case involves the extent to which government may regulate express advocacy on ballot measures consistent with the First Amendment. The laws of California impose a number of burdens on ballot measure advocacy and presents at least one novel question, which is whether the government may condition express advocacy on ballot measures by requiring that some donors to a multi-purpose organization must be disclosed, even though those donors did not give the money for ballot measure advocacy. We believe that the California regulations fail the strict scrutiny which this Court held those regulations must meet. Now, on remand, this Court directed that the district court consider whether California had an informational interest which was compelling, and second, whether the California regulations are narrowly tailored to advance that interest if they have such a compelling interest. Now, we agree that the state's informational interest is compelling, and we accept that based in part on what the district court explained, and that is that people with respect to ballot measures often base their decisions on those measures on the identity of those who make contributions or expenditures for or against such measures. That cues the voting public to who will benefit if these measures are adopted. The problem here is not the presence of a compelling governmental interest, but whether or not the regulations are narrowly tailored, which we believe they are not. Now, the Supreme Court in Buckley and MCFL considered the question of what sort of burden may be imposed upon independent expenditures, whether they be candidates or ballot measures, and held that the informational interest that the government has is satisfied by a one-page, one-time report, which lists the expenditures by the organization spent on the independent expenditure and the contributors who gave money to the organization for the purpose of that expenditure. Now, California has a much different system. They impose multiple burdens, many tax-type burdens on an organization, which, such as California Pro-Life Council, has done two independent expenditures on ballot measures in a five-year period, or were going to, but because of the burdens imposed by these regulations were chilled and did not do the second expenditure, because upon doing the second expenditure, the second time in five years that you spend more than $1,000 on advocating a ballot measure, you're considered a recipient committee. Recipient committees have a number of burdens imposed upon the entire organization, including, first, that based upon a pro-rata formulation, that individuals who have contributed to the organization, donors, but who are not contributors, because contributors, that's a word of art under California's scheme, and a contribution is anything of value for the purpose of influencing a ballot measure. Now, we agree that those can be reported, as I have already explained, that the Supreme Court has upheld the reporting of contributors for independent expenditures, that is, when they make the contribution to the organization for the purpose of influencing the ballot measure in this case. Oh, here's a question for you. How can we know what was in the mind of someone who gives money to an organization? And, you know, if you say, if we adopt a distinction between persons with an intent to donate, but who don't really want it to go to politics or know about that, and others, does that wipe out the act? I mean, can you ever regulate this? Certainly you can. Explain your position on that. Well, the U.S. Supreme Court in Buckley said that when we're dealing with a group whose major purpose is involvement in politics, then for that organization, which are called PACs, for that organization, all contributions to that organization are considered to be for political advocacy. So let's say you're dealing with a group who has a different major purpose. Has the Supreme Court said that you can't regulate that entity if it makes some political contribution? You can regulate them by requiring a report, a one-time, one-page report that they upheld in Massachusetts Citizen for Life. This very argument was made. The FEC said, well, look, you know, we don't know what's going on here. These organizations should be PACs because they're engaging in politics so we can see who their donors are. And the Supreme Court said, no, we're not going to impose requirement that all of your contributions and expenditures and other PAC-type burdens be imposed upon you unless it's your major purpose. If it's your major purpose, then every contribution, every donation to a PAC is a contribution by law. So they really set up two different, you know, two different schemes. One is much more regulation for major purpose entities, much less regulation when it's a multipurpose entity. And the reason is, they explained in Buckley, is because of the burdens that are imposed on multipurpose entities undermine their ability to participate in our democratic process. For instance, mere disclosure. You hear these words together, mere disclosure. Well, mere disclosure can impose an incredible burden on an organization. And that was found by the Supreme Court in NAACP versus Alabama, when the state of Alabama in the late 40s wanted to know the membership list of the NAACP that was conducting a boycott of white businesses in Birmingham, Alabama. That was a little different, though, because there was evidence in the records that disclosure of those members subjected them to economic reprisal and threats of physical harm. So that's a little different. But the Supreme Court in Buckley in 1976 took that case, the rationale of that case, and said that disclosing the members or identity of contributors to a private organization undermines the ability of private organizations to function, and therefore applied it to campaign finance laws and said that PAC-type disclosures of the identity of contributors or donors to a multipurpose organization cannot be required, because it inherently undermines the ability of those private organizations to raise funds and be effective. So that's why I say there's really two different types of entities. One is major purpose, and the other is not major purpose. Now, the second distinction here is we're involved with a ballot measure. We're not involved with candidates. I mean, the Supreme Court found three compelling governmental interests for PAC-type disclosure on major purpose organizations. And one of them was the danger of and the appearance of corruption, that is, the influence that PACs or donors have over candidates. Well, that's not present here. And this Court held when we were here the first time that the only governmental interest regarding ballot measures is the informational interest of voters knowing who is contributing and expending money in support of those ballot measures. And finally, the 2009th Circuit case of Montana Chamber of Commerce explained the significance of that. They said it is even more burdensome to impose PAC-type requirements on ballot measure committees because there we're not talking about corruption of candidates, and there we're talking about the most pure and fundamental political speech regarding issues in our democratic system. Counsel, in your view, what are the PAC-type requirements in this statute that you object to? Well, the first is, well, there are two types. I didn't decide the disclosure because we know that. The disclosure requirement. In addition to that, what are the other PAC-type requirements that you object to? Number one, you have to register as a political committee. This is not a political committee. This is a lobby group, an educational group. So they are compelled by the government to identify themselves as a political action committee. Okay, the registration, what else? Number two is that they cannot terminate, well, they have to file periodic reports. Not a one-time, one-page report, but periodic reports which they cannot terminate until they promise, in essence, that they'll never do a ballot measure advocacy ever again in history. Okay, so that's the second one. So it goes on forever. Right, I understand. Okay, because they've done it twice, it goes on forever. Third is the, or fourth is the recordkeeping requirement. Well, this is third in addition to disclosure, right? I said registration, periodic reports. All right. Termination limitations. Okay. And finally, recordkeeping. Okay. Now, all of those, none of those have anything to do with the interest in information for the voters. I understand. Okay, and that's the only compelling interest this Court has recognized, and I think consistent with Supreme Court precedent, has recognized can justify a regulation of a ballot measure, and none of those have anything to do with that governmental interest. Mr. Bob, one question that occurred to me, why doesn't your client form a PAC, and any people that wanted to help on the ballot issue could give it to the PAC? Well, in some cases they do, and they have. But, you know, in other cases, these things arise. All right. PAC, running a PAC, raising the money into the PAC, you have to raise it separately from what, from your general treasury funds, you know, that takes a certain amount of planning. A lot of advocacy with respect to ballot measures just occurs. In other words, they decide that they want to do it. They don't want to go through the efforts to form a PAC. And, of course, the Supreme Court in First National Bank v. Bilotti said that corporations have an absolutely protected First Amendment constitutional right to engage in ballot measure advocacy. That's not only the case. But, I mean, it's possible that if they want to put their toe into the political waters, they have to make the disclosures and that they could avoid that by setting up a separate PAC. That's true. But, again, there are costs. I mean, there are costs to each. California has imposed burdens on each option. Okay? I mean, if you set up a PAC, you have those burdens. If you don't and you're subject to these recipient committee requirements, including the disclosure of people who contributed within the last year, I mean, what nexus is there between the governmental interest in disclosing contributors with somebody who's given a general purpose contribution to an organization, or, in fact, a contribution to an organization earmarked for something else? Now, for the first time in the history of this litigation, we've been to the district court twice. This is the second time to the Ninth Circuit. For the first time, the government is saying, well, if it's earmarked for another purpose, it doesn't fall in the pool for disclosure. Now, you know, this is a brand-new argument. We've been arguing our position for all of these different trips. And if you look at the affidavits, which they had submitted, on how you comply with this pro rata reporting of donors within the last year, they are uncategorical that this regulation has defined as a matter of law that people, that donors who fall under that pro rata amount are contributors under the regulation and under the way it is enforced. And it is not that, you know, you can somehow or another opt these people out. But in any event, you know, regardless of the resolution of that issue, of these earmarking for other projects, then I'll measure advocacy. Just a general purpose contribution to an organization that spends, whose budget is $225,000, and is going to spend a little more than $1,000 triggering reporting and all this and regulation as a recipient committee. A little more than $1,000 on advocating a ballot measure. What is the nexus between those two things in terms of the governmental interest? I mean, the effect of this reporting of these donors is to report people who are either irrelevant to the ballot measure or it's actually misleading. In other words, somebody who 11 months ago gave a contribution to this organization, 11 months later the organization decides to participate in a ballot measure that may not even have been on the ballot or even considered at the time this person made a contribution. This person may oppose or support the ballot measure unknown. And now this person is being reported as a contributor to this ballot measure, this specific ballot measure. That is misleading. Does the record tell us anything about impact on your client's organization in order to make that disclosure? Yeah. Well, yes, a person did a study of past expenditures by the organization and said that one of his models said that California Pro-Life Council would have to report three donors, not contributors, because they didn't give the money for the ballot measure, but just random donors to the organization. So that was one study that was done in terms of the effect. I'm wondering if you make the disclosure, will it affect whether people support the organization? Well, we believe it would affect them. And the Supreme Court in Buckley has taken the NACP case from the facts of that case and established a principle that reporting of private organizations of their contributors and donors, particularly unpopular, disfavored organizations like my client in the state of California, will undermine the ability of those organizations to be effective. And consider this, every donor to the California Pro-Life Council under this scheme, every single donor must consider that their contribution will be reported based upon future totally speculative events. That, of course, happened, does happen. That is, the California Pro-Life Council, 11 months from now, will decide that there's a ballot measure that they want to make an expenditure on. Okay. You may want to reserve a couple of minutes. I do. Thank you. We'll give you three minutes rebuttal. We'll add another minute here for the appellee. Good afternoon. My name is Terri Block. I represent the State Attorney General. Seated at Council's table with me is Lawrence Woodlock, Senior Counsel for the Fair Political Practices Commission. I intend to address the Court for approximately 15 minutes, after which Mr. Woodlock will offer some further thoughts from the Fair Political Practices Commission. What is at stake here is the integrity of our political system. It's a system in which money talks. And the only way to maintain the integrity of the system is to ensure that the voters know who's doing the talking, who's paying for the political speech. That sounds like a corruption argument. I thought this was an informational statute. It is an informational statute. The only thing that's at issue here is the disclosure provisions of the PRA. But the information will aid the voter as to voting. Correct. I don't see how you bring in money talks. That's not quite the issue. Well, I think that it certainly, though, does speak to the issue of informing voters about who's really doing the sponsoring behind some of these ballot initiatives. It's Shell Oil's doing the talking that perhaps might sway the voters, despite the fact that the organization whose name appears at the bottom of a piece of literature is the Citizens for a Better Environment. So if we know who's supporting these ballot measures, we know a little bit more about whether we want to vote for them. Do you know who supported this ballot measure that you're defending? We're not defending a ballot measure, Judge Newman. We're simply defending the constitutionality of the disclosure provisions. No, but it was enacted by a referendum, was it not? I believe it was, yes. It was? Yes. Who supported that? Who was behind it? I'm not – I don't know that. The voters voted? Apparently they had a pretty good law. Apparently. It's been on the books for 30 years, so it's apparently doing something. You don't know who was behind it? I don't know. I certainly don't. These things don't fly out of the air. That's right, and that's why it's important that we have disclosure, so that people know who is behind these ballot measures. Well, most recently we've read in the headlines that $330 million were spent on ballot measures alone. At the time that this case was filed, there were $250 million spent on ballot measures. So it's a big business in California. What we're asking the court to do here is to affirm the district court's grant of summary judgment for two reasons. Number one, because the narrow legal premise on which the appellants rely is invalid. And number two, because the district court properly determined that this law survives constitutional inquiry. The narrow legal premise on which the appellants rely is that the PRA disclosure requirements offend the First Amendment because they regulate ballot issue advocacy, and they cite Buckley for this proposition when, in fact, Buckley did not stand for this proposition. Mr. Bott made precisely the same argument before this court in July of 2005 when he argued in Alaska Right to Life that the Alaska disclosure laws were unconstitutional for exactly the same reason, citing Buckley. And this court rejected that argument, citing the McConnell decision, a Supreme Court decision in 2003 which explained and clarified that Buckley did not draw a constitutional distinction between candidate advocacy and so-called issue advocacy, which is what's at issue here. So in light of the fact that the only remaining counts in this lawsuit are based solely on the premise that Buckley precludes issue advocacy, which is a proposition that's been rejected by this court and the Supreme Court, we would ask the court to affirm the district court's grant of summary judgment. On the broader legal question, it looks like we're narrowly focused on the narrowly tailored analysis because counsel has conceded that there's a compelling state interest in keeping voters informed about who's lobbying for their votes. So in turning to that question as a preliminary matter, the narrowly tailored question, the Supreme Court has been less than clear in instructing us on what level of scrutiny should apply to disclosure requirements. And this court noted that lack of clarity in Alaska Right to Life, which was the 2006 decision coming out of the Ninth Circuit, when the court observed that in Buckley the Supreme Court applied exacting scrutiny to the disclosure requirements at issue there, which required a substantial relationship between governmental interests and the information being requested. In McConnell ---- We have a prior opinion, right? Yes. In Gatlin. Yes. Doesn't that, for our panel, resolve the issue of the level of scrutiny? It seems like in the mandate of, if I'm recalling it, they said you've got to look at whether there is a compelling state interest that's informational and whether measures are narrowly tailored to that. So I know there might be some argument. Does that still apply in light of whatever we've heard from the Supreme Court since then, but are you contending that that's not the law of the case? I'm contending that there is still some room for debate on the question of whether strict scrutiny applies. However, if the court ---- A debate in general or a debate in this case? A debate in this case in light of the decision in McConnell, which the Gatlin panel didn't have the benefit of, because that decision came out of the Supreme Court after Gatlin was decided. Well, it's certainly an intervening higher authority. Is McConnell inconsistent with what the prior opinion says? I would simply point out that there is room under McConnell to apply a less, a more relaxed standard to disclosure requirements, because McConnell upheld the law there, the disclosure requirements there, because they served merely an important State interest as opposed to a compelling State interest. Nevertheless ---- Let me ask you a couple of questions about how this does inform the voters. What's the date on which in a general election that one of the ---- someone must report their contributors? What's the date on which that happens? Well, there's a four-year reporting cycle. Well, no. I mean, the election is November 2nd. What date do you have to report? That's an excellent question, Judge Newnan. I would have to ---- You don't know. Isn't it? It's October 5th. I wouldn't want to misrep ---- You're probably correct. I just wouldn't ---- Correct. I wouldn't want to misrepresent. Correct. There's a whole month where typically people spend a lot of money, and that's not being reported. It's a big hole. Well, the law has to be narrowly tailored to serve a ---- Right now, it's just that the law is a wonder bus. It doesn't go off. Now, I wouldn't ---- I mean, you've got to have a law that's a workable law to impose burdens. Now, I want to ask you about how the information gets to the voter. Somebody files something with the Secretary of State? That's correct. How does it get out to the average voter? Well, it's available as a matter of public record. Obviously ---- I know that. Does the average voter go to the Secretary of State's office? Well, the average voter certainly has an opportunity to talk with the Secretary of State to find out ---- How many voters in California do you imagine would ever do that? Well, we don't know. We don't have any statistics about that. Use a little common sense. The only way that gets into any voter's hands is through the media. Isn't that correct? That's one way. Well, it's the principal way. And do you think the media is nonpartisan? No. No. So the media is going to select the information they think will help their cause. So you have a system that is totally ineffective unless the media plays a part. And then the media is a partisan when it plays a part. That's true, Your Honor. However, we have to make as much information available that is reliable, that is unbiased. Well, you know the way people do it. You quote this disparaging remark from the ballot pamphlets we all get. But if you voted in California, as I assume you have, you know how most people read that. They don't read all the stuff on the legislative analysis and so forth. They look at the names of the people arguing for and against. It's a very simple way that you'd have to be spending more time than a law professor would to read through all it. But then you look at those names, and right away you know who's for it and who's against it. That's correct. That's correct. The primary way is not the testimony of your expert. Well, that's one. McCain, wasn't that what he testified? That is one way to get that information into the voters' hands. It's pretty important information, and it goes to everybody, not just the people who read the Los Angeles Times. Well, and that's a more onerous restriction to place on these groups, Your Honor, than what California's law is. California's law is simply more onerous. Yes. What is the more onerous burden? It's a more chilling burden to put the names of sponsors on the face of political literature that goes out to the- It goes in the official ballot pamphlet that goes to everybody. You're talking about the thing that accompanies- The secretary sends it out to everybody. Correct. Everybody can read it. Right. Everybody can see. It's not some phantom organization. They see the names of the people who are supporting it. And in some cases, you can tell right away that there are either advocates for this or that. If there's some kind of fakery going on, the media can immediately pick it up. Well, the attempt here, Your Honor, is to provide as much information as possible through public sources. But is it providing it fairly and evenly across the board? Yes, it is. Why? Yes, it is because it's- Do you agree it depends on the media? And you agree the media is partisan. How can it be done fairly, then? I did not agree that it depends on the media. What I said is- What's the source besides the media? It's available through public records. Well, now, how many people would ever go to the Secretary of State's office and look up the public record? We cannot- Aside from the newspaper report. We don't have any control over that. We simply make that available. How people live and act in California, that's part of our business to know how people live. That's a fantasy that you think that people would go and look up the files. Well- It is a fantasy. With respect, I'm saying this is the way the California statute works. It does, but it doesn't work well. And we're saying that it works well enough to satisfy strict scrutiny because it's narrowly tailored to serve a compelling state interest. It strikes me that it may be that the press is partisan, but if you read enough partisan press and read some from each side, you know, that may balance out somewhat that- Well, the California- Yes, go ahead. How many different newspapers can marshal what they want from the Secretary of State's office? You know, if one organization slants at another and look at it differently, how can information ever be made public except by putting it on a public record? That's step number one. Counsel, is this information available through the Internet? Yes, I would think- Do you have any idea how many hits there are on this website? I don't have that information, no. Because that would give us some idea of how many people are accessing it in addition to the media. The important thing, I think, to focus on is that the information is available publicly, just like all public records are, so that when voters have questions about who is supporting these ballot measures, it's readily available to them, either by picking up the telephone or going to the Internet or visiting the Secretary of State's office. If they'd picked up the telephone, what would they want? They'd probably get a voicemail. Perhaps they might have to exercise a bit of patience, but the information is available. Let me ask you a question. I'm not too-I'm not-I mean, I'm only one judge. I'm not personally all that concerned about how something is made public once it's public record, if it is legitimate to make it public record. But how do you respond to the appellant's argument that there has to be a major purpose of an organization to affect politics before you subject them to all this? Well, that's a misreading, I would say, Judge Gould, of the Buckley case. The appellants are arguing that Buckley established a major purpose test, and essentially the major purpose verbiage was in reference to the Trump political committee, which was very vaguely defined under the Federal Elections Campaign Act. And so what the court was attempting to do in Buckley was to narrowly define that term for purposes of the Federal Act to include only committees or organizations that are either controlled by a political candidate or whose major purpose was to elect or defeat a clearly identified political candidate. That's language directly from the Buckley opinion. Since Buckley, the Supreme Court has made clear that that verbiage was simply a matter of statutory construction, focused exclusively on the Federal Act, and that it doesn't have the broad application and certainly doesn't establish some sort of a constitutional test for purposes of other campaign finance disclosure laws. So we would suggest that the major purpose test doesn't apply here. Moreover, Buckley dealt exclusively with the election of Federal candidates. It had nothing to do with ballot initiatives because there are no Federal ballot initiatives or referenda. Counsel, are the major purpose allegations still at issue in this case? Well, the appellants claim that you need to establish a major purpose of presumably, I'm guessing, extrapolating from Buckley that the major purpose would be to defeat or to enact a political referendum. I thought those claims were all dismissed either by the court or through stipulation. So that's why I'm a little confused as to why we're talking about major purpose, because I thought those allegations were all out of the picture now. Thank you, Judge Rawlinson. You're right.  And as I said at the outset, those claims are based exclusively on the claim that Buckley precludes ballot measure advocacy, regulation of ballot measure advocacy. That's the sole premise on which the remaining three counts rest. And since this Court and the Supreme Court have rejected that argument, there are grounds on that alone to affirm the district court's grant of some action. Counsel, briefly, because your time is running out, could you respond to opposing counsel's distinction of the committee-like requirements, the PAC-like requirements that are contained in the statute? Yes. This law is narrowly tailored to require disclosure only of those funds that are used, actually used for political advocacy, whereas a PAC is required to disclose all of their expenditures. What about the registration requirement, the termination requirements? Those are separate and apart from the disclosure requirements. How are those narrowly tailored for the informational interest? They are short forms. They are simple forms, straightforward. They are accompanied by an instruction form that explains how to complete these forms. They are simply a way to gather the information, the most basic information about these organizations, so that the voters have access to that information. But why do you need that for the informational interest on disclosure, on donations or contributions? Why would you need that additional information to fulfill the compelling interest in knowing who the donors are? Simply to give the voters full information about who the pro-life counsel is, for example, who these multipurpose groups are, and who is donating to them. They just simply need to identify a treasurer and some basic information about the organization itself. Counsel, you've gone about three minutes past the 15 minute mark. I'm so sorry. I'm going to give your colleague some time, but I need you to complete. Thank you, Judge Gould. I'm going to let Mr. Woodlock conclude for me. I will say preliminarily that I'll take responsibility for sort of screwing up the time clock here. But we're going to let you have your five minutes that you want, and then I'll give Mr. Bopp a few extra minutes to equalize this. Thank you, Your Honor. I come to the table with some questions to answer already, so I'd like to take them up. Judge Rawlinson, on the PAC burdens that you just asked about, I would remind the Court about its own decision in Alaska. And, in fact, the three burdens that appellant has alleged here, registration, termination, and PAC reporting, this is aside from the disclosure, two of these three were treated in Alaska, and Alaska's rules are indistinguishable from California's. Committee registration, Alaska required entities like CPLC, which are called non-group entities in Alaska, to fill out a two-page form with basic contact name information. California requires exactly the same. Form 410, you fill out a cover sheet with the contact information and then two lines on the second page. Now, termination, that didn't come up in Alaska, the burdens of termination. So I can't use Alaska to suggest to the Court that this is a normal kind of process. What I can do, though, is direct the Court to federal law because federal law is exactly the same. The relevant regulation for terminating committees under federal law is 11 CFR section 102.3. And if the Court reads that, the Court will find that an entity terminating a PAC has to do exactly the same things under the federal system as under the federal system. Counsel, that presupposes that the organization is a PAC. And in this case, this is a multipurpose organization. So that begs the question as to whether or not PAC-like requirements should be imposed. Well, it does, Your Honor. But we should remember that under federal law, CPLC is required to have a PAC. It doesn't have the option that California offers it. So in California, I think the trial court, the trial judge was arguing that, indeed, we could simply mimic federal law and require CPLC to have a PAC. If that's true, then the termination burdens, which are the same under state law and under federal law, if they pass muster under, you know, federal scrutiny, they should here as well. But it is true that CPLC may assume PAC-like burdens. If it decides not to organize a PAC, it has to report its political activities. And it would, having taken the second bite of the apple, then basically become a committee. Again, its burdens, if it goes this route, are no greater than if it had formed a PAC, because it's a crucial distinction here, which is often obscured in the briefing, that if CPLC becomes a PAC, it does not disclose everything that it does. It only accounts for the money spent on expressed political advocacy and the source of those funds. I'm going to move quickly. Media biases. I agree with Judge Newman. The media are biased. But I also agree with Judge Gould that they have competing biases. There is quite a large cacophony out there among the media. And I do think that multiple media outlets tend to smooth over any biases in reporting. One thing we haven't thought of, though, is the opposition. In fact, the biggest consumer of these campaign disclosure reports is the opposition, whether it's opposition to a ballot measure or the candidates. They study these data very carefully, and they make what use of it they can. It's a very Darwinian system. But we would argue that this serves First Amendment values. Mr. Bob started by noting that this case presents a novel question on what he calls true contributions. And I would like to emphasize that that's not really correct. Mr. Bob made the very same argument to the Supreme Court four years ago in FEC versus Beaumont, which we cited, I think, on page 43 of our brief. In footnote 7 of Beaumont, the Court addressed at some length the contention on brief, and it came to a conclusion that to treat the earmarking provision as the outer limit of acceptable tailoring would disarm any serious effort to limit circumvention. I'm afraid I'm out of time. I had more to say, but I'll stop here. We appreciate the argument. Now, Mr. Bob, as I'm seeing it, you probably have a right to another eight minutes if you need beyond that. I'm trying to equalize the time. Thank you, Your Honor. I would give you up to nine minutes, but I hope you don't have to use it all. I sure hope I won't. The remand with respect to the major purpose issue is specific, and that is it is true that complaints against the statute for failure to have the major purpose test have been dismissed. The question is for an organization like CPLC that's multipurpose, so their major purpose is not political activity, it are the regulations that are imposed upon them, do they pass strict scrutiny? So that's how the major purpose works into this question. And, of course, you know, they have not argued that this is not the law of the case, that strict scrutiny is applicable here, and McConnell really doesn't change the analysis. There's no question that in Buckley and MCFL, the Supreme Court imposed strict scrutiny for, quote, mere disclosure. It is also true that McConnell was a little equivocal when they talked about important interests rather than compelling interests. But if they were going to overrule Buckley and MCFL, then they would have done so. So I think there's no way to say that McConnell necessitates, you know, this court imposing a different scrutiny standard than this court held was applicable to this case in the prior decision. Third, Alaska right to life is different in kind from this case. Alaska right to life involved not ballot measures, but candidate advocacy. And the Supreme Court and this court in Montana Chamber of Commerce has pointed out that that is different, that, number one, there are three interests that would justify regulation of candidate advocacy. There's only one interest that will justify the regulation of ballot measure advocacy. And, of course, referring to federal law, federal law doesn't have anything to do with ballot measures. It's all about candidate elections. And furthermore, in Alaska, the only contributors were required to be disclosed in their disclosure reports. That is people who have given something of value for the purpose of influencing, in that case, candidate elections. Here, California goes goes broader than that. They are essentially the red light. Can you add some more time to the clock? I said we would give him. Could you add some more time to his clock so it's not taken out of the red? Add five minutes. They'll make it about even. I said I sort of lost count of the time. Finish within five minutes, Max. Thank you. California goes beyond that, beyond what was approved in MCCFL and Buckley, which was a one-time report of contributors for an independent expenditure. And they are snagging people who happen to contribute to the organization, but not for the purpose of ballot measure or candidate advocacy. I mean, this is the government now as a matter of government fiat saying Joe Blow, who gave money 11 months ago for either no purpose or for other purposes of this organization, is now going to be designated by the government as supporting this ballot initiative. This ballot initiative may not have even been proposed when that person gave the contribution. Now, that is at least irrelevant, probably misleading, and certainly wrong for the government to assign to private individuals who donated to a multi-purpose organization whose primary activity is lobbying and education, assigning to them that they support or oppose this specific ballot measure. Thank you. Okay. Thank you. That will conclude the argument. We will submit the California pro-life case on this Court. And thanks to counsel for very nice arguments. Thank you. Thank you. This Court is closed. Session is adjourned.
judges: Noonan, Gould, Rawlinson